Good morning, Your Honors. Good morning. I'm Michael Sorgan, and I represent Trina Davis and Valerie Tabron in this appeal. I would like to reserve five minutes for a rebuttal argument. You have a clock there. Thank you. And if the Court please. The District Court did recognize that this case was rife with conduct that, if true, is quite offensive. And the Court found that there was a hostile work environment sufficient to survive summary judgment. And I dare say, without ñ and knowing that this Court is quite familiar with sexual harassment cases ñ in fact, this very same panel was on the Steiner case, which is one of the leading cases in this circuit. But I dare say that the case at bar is different, strikingly different, from other cases that I've ever encountered, and I believe than other cases that the Court has seen. This is not a situation where there is one perpetrator and one victim and one or two incidents, no matter how egregious this case And I think that's why the District Court had to recognize that the atmosphere was rife with hostility. This is a case of overwhelming, pervasive, vulgar and humiliating conduct, gestures, comments, that would make it virtually impossible for any reasonable woman, quoting from the Ellison case. I understand that the District Court said that the record was so inadequate that he wasn't going to mine it to determine any of the issues on the merits. Is that right? That is what the District Court did. In fact, I've been looking at this pile of paper in front of Judge Kaczynski, wondering if I was to anticipate some comment. And I know the Court is aware that I was not the attorney at the trial level. That won't save you. But I think the Court is also aware that the plaintiffs in this case are also innocent. But notwithstanding, I do feel that when the District Court said it's not the duty of the Court to mine the record looking for evidence favorable to the plaintiffs, the Court was actually quoting from a Ninth Circuit precedent, which disfavors supplementing the record on appeal. You mean adding stuff to the record that wasn't in it in the trial court? That's right, like the Carman case. And I think the Carman case is the one that uses that language about not having to mine the record. Well, what I want you to try to persuade us of is that that record at the District Court level was adequate and that the District Court judge should have referred to it. Now, are you going to be able to do that? The record was certainly adequate. When I say the record was adequate, I mean that the citation at the summary judgment stage to the record was adequate to point the judge to the things that he needed to know. Okay. Well, unfortunately, what counsel did in this case was while they had four declarations, and I think those declarations had plenty of facts that would have been sufficient to survive a summary judgment, they unfortunately also threw into the record one, two, three, four, five, six, ten depositions without the exhibits to those depositions and, you know, kind of pretty much left it at that, except. When you say they, you mean the plaintiff's attorney? Plaintiff's attorney. But in the brief that was, that plaintiff's attorneys wrote in opposition to the summary judgment below, while it wasn't a model of literacy, it did contain a 15 or 16 pages of it were an explication of the facts, and there were numerous citations to the record, a few of which were inaccurate, but most of which were accurate. Is this the amended plaintiff's opposition dated September 25 that you're referring to? I'm not sure, Your Honor. I read it yesterday. You're giving me a document called a brief. I just want to make, I want to know. There was a brief that was about, was between 25 and 30 pages long. Is it in the record? Yes, it is. Where? Maybe I can find that and come up with it during my five minutes of rebuttal, Your Honor. Was it filed by John Taylor? Yes, it was. He was the attorney in the trial court. I mean, does it look like this? It says amended on it? I didn't remember that it said amended. I have to look at the record. You know, when you tell us that something works in your favor, we like to look at it. That's all I'm asking for. And where is it? During my rebuttal time, I'll give the Court the exact pages in the bait stamp pages of the record to find that. I'm just making a note of it now. Do you have a copy of the extra proof here? I have my notes, which will have the bait stamp pages. Do you have a question about my copy? I'm sure you have. I don't think it's necessary, Your Honor. Thank you for your assistance. But when I read the brief yesterday, I noted that it had about 15 pages of facts with numerous citations to the record. And the one thing that they did very well was they explained with citations to the record that the city kept changing the reasons it gave for the retaliation. Now, the district court very clearly recognized the ---- Once you call it retaliation, it's hardly ---- The reasons for the action that the plaintiffs claimed were retaliation. I feel pretty confident calling it retaliation because of the timing, for one thing. It just sort of sounded to me like they were saying, well, it's retaliation, but here's a good reason for it. Well, no, the city didn't admit that it was retaliation, obviously. But it's true that after complaining many times about O'Brien's conduct to three different supervisors ---- The reduction in work came ---- what is the sequence? Came about, what, 15 days after they complained? You're right. The written complaint to Jones was in April, April 10. And the shift change, which cost them a 5% differential, was on April 20. And the loss of the general assistant that they were supervising, which cost them another differential, was May 4th. Was there any evidence in the record that this reduction was pursuant to some preexisting plan or anything of that sort? Well, the city claimed there was a preexisting plan, but the fact was, and was supported in the record, that the plaintiffs were singled out. And the district court seems to think ---- well, the district court found that their supervisory status was restored upon reconsideration. But we point out in the brief with the citation, I think our brief has a lot of citations to the record, and the facts are certainly extensive, if not unwieldy. But we point out that they never again had general assistants assigned to them, and so they never did regain the pay differential. And the timing, you know, was even recognized by the district court. And also, I think in the lower court, Mr. Taylor did point out, with citations to the record, all the different reasons the city gave for these actions and why none of them made any sense. So in that area, I think we only did a slightly better job in the brief. But I think the big issue in this case, aside from the record, is ---- There are two big issues in this case, and they're kind of intertwined. One is whether the district court properly disaggregated the supervisor, Cardwell's, conduct. Well, it wasn't conduct. It was more comments that she made. You mean disaggregated. Disaggregated from the ---- Whether the district court separated out the frequently iterated offensive comments of Supervisor Cardwell from all the offensive comments, gestures, and activities of the coworkers. Because when you've got adverse action that follows the sexual harassment complaints, I think the supervisors, the city, you know, is vicariously liable for supervisor conduct. So by separating it out, the district court found that, well, Cardwell's comments weren't sufficient standing by themselves to constitute a hostile environment. Do you want to save ten minutes for rebuttal? I'm sorry? You're at your halfway point in time. Maybe it's more productive to save half your time for rebuttal. I want you to hear what the city has to say. Okay. Thank you. Okay. We'll hear from the city. If you need the excerpt, just tell the clerk and she'll come with you if you actually need the ---- Good morning, Your Honors. May it please the court, my name is Jonathan Rolnick. I'm a deputy city attorney here representing the city and county of San Francisco. How are you, Mr. Rolnick? I'm fine, thank you. Pretty egregious facts here.  Pretty egregious facts here. There are egregious facts here, and I believe Justice ---- A lot of foot dragging on the part of the city. Judge Jenkins recognized that there was sufficient evidence here to create, under a totality of the circumstances, a hostile work environment. But he also determined ---- He was right about that, wasn't he? Excuse me? I mean, you're sure right about that. The city does not dispute that. But Judge Jenkins was correct in granting the summary judgment motion and looking at what the city had done, one, with respect to the coworkers who had engaged in the conduct and that it had taken appropriate remedial action. And Judge Jenkins was also correct in analyzing, disaggregating, as Mr. Sorgen suggests ---- Help me out here. So we have now established, for purposes of this appeal, there was a hostile work environment. What is the test for remedial action under our case law? The test is ---- Fuller and the like. What is the test? I think the test is really quite simple, which is that the employer must take steps appropriate to remedy the situation and ---- Isn't prompt part of the test? Correct. Prompt. It has to be prompt. It has to be adequate. Correct. And adequate has two meanings, both of which must be met. It must be adequate to punish, so a slap in the wrist is not adequate because it's not commensurate. And it also has to be adequate to deter future conduct. Correct. What the city did here undisputably meets, undisputably. Yes, I believe that it did. With respect to the ---- Tell us about that. Well, with respect to the ---- First, let me just ---- One thing. With respect to the slap on the wrist, I think what is appropriate under circumstances, a slap on the wrist might be appropriate depending on what the transgression is. And as the transgressions increases ---- You have already said that this was pretty egregious conduct, so we are past that point. The city ---- As our case suggests, is when the conduct is pretty egregious, slapping the wrist is never good enough. Well, the conduct is egregious, but the conduct is egregious because of the totality, and there are a variety of actors. With respect to each individual actor, there may be different appropriate measures that one takes. That's fair enough. So why don't you relate conduct to remedial measure and show us how it's indisputably ---- For example, with respect to Mr. O'Brien, who engaged in what I think was the most egregious conduct, when the city was ---- Not so egregious if you're not going to want to repeat some of that stuff here, right? Correct. When Mr. Jones, who was the supervisor who managed this facility, was put on notice of his conduct, he immediately transferred him and recommended him for suspension. He was transferred away from the facility, and he was suspended for a number of days. It took some time for the suspension to actually ---- I think it was actually placed on suspension, and there was some time lag as to whether or not it's going to be paid or unpaid because of a union grievance, but he was immediately suspended and transferred from the facility. Ms. Cardwell ---- Immediately after what? After the complaint from the plaintiffs about his conduct. A complaint to whom? To Mr. Jones, who was the manager of the facility. They had had a conversation, Mr. Jones, with Ms. Cardwell, with the plaintiffs and with Mr. O'Brien, and during that conversation, one of the plaintiffs had mentioned, without giving any specifics, some problems that they were having working with Mr. O'Brien. Mr. Jones, who was a supervisor, said, please give me the specifics of that, put it in writing to me so I know what you're talking about, saying you're having problems working with someone. I don't know what that means. A written letter was provided by, I believe it was Ms. Davis, and when Mr. Jones received that letter, he suspended Mr. O'Brien, went about finding him a transfer to another facility so he would no longer be working with the plaintiffs, and he, in fact, was suspended for, I believe, 10 days, unpaid suspension. Ms. Cardwell, when the complaint came forward with respect to Ms. Cardwell, she was removed from her supervisory duties with respect to the plaintiffs and assigned other duties in the facility. The same pattern holds true with respect to the other. I'm sorry. Cardwell was a supervisor herself. Correct. She succeeded as foreman. Correct. You asked me generally about the remedial steps. I'm not distinguishing here between coworkers versus the supervisor. I'm just giving you some examples of how the city addressed the work transgressions. You're talking about the complaint to Jones. Correct. Was that the first complaint? Was the complaint to Cardwell and before that to foreman? I'm sorry. Excuse me, Your Honor. Am I getting a sequence? Was the complaint to Jones the first complaint? Correct. There was no earlier complaints to Cardwell? There was no earlier complaints. There were some earlier complaints from Ms. Davis to a previous supervisor, which she acknowledged in her deposition the supervisor addressed and that she had no further problems with Mr. O'Brien until the conduct renewed, which resulted in the complaint to Mr. Jones, who then removed Mr. O'Brien from the work environment. She didn't complain to foreman about O'Brien? To foreman? Yes. Yes, she did complain to Mr. Foreman about O'Brien. Correct. And I believe the evidence in the record demonstrates from her deposition that she admitted that Mr. Foreman took appropriate steps to ensure that Mr. O'Brien ceased his conduct, and that occurred for a period of time, and then it renewed again, and that led to the second complaint about Mr. O'Brien to Mr. Jones. Who was Mr. Bowersox? Mr. Bowersmith was a coworker. I'm still having trouble with the sequence. Foreman was succeeded by Cardwell, right? Correct. And weren't there complaints to Cardwell? There were no complaints to Cardwell about O'Brien. The complaints were from directly to Mr. Jones during this meeting in approximately April of 1999. And this Cardwell had only been their supervisor for a brief period of time prior to these complaints. Okay. So they complained to foreman? To Jones. Correct. And that had been some period before the later complaint in 1999, early 1999, to Mr. Jones. What happened to O'Brien after the complaint to Foreman? As I understand it, Mr. Foreman talked to Mr. O'Brien and told him that that kind of conduct was not appropriate and he needed to cut it out or else there would be repercussions for that. And as far as I understand, based on the testimony of Ms. Davis, did, in fact, Mr. O'Brien stop his conduct? Is that adequate under Fuller? Yes, I believe it is. Conduct is egregious. It's simply talking to an employee and getting him to stop for a while enough. I don't believe that the record demonstrates that Mr. O'Brien's conduct in the initial blush was egregious. We're talking about egregious when we look at the totality of it after the fact. There's no record that plaintiffs have put forward that Mr. O'Brien's conduct at this earlier period of time was egregious. There's only evidence that she had complained about him making some inappropriate statements and that they had talked to Mr. Foreman about it and that Mr. Foreman had apparently got Mr. O'Brien to cease that behavior. But there's no evidence in the record as to what the statements were specifically Mr. O'Brien had made. Well, you say cease. Cease for a while and then he picked it up again. Correct. And then there was a subsequent complaint to Mr. Jones at which time. So could the jury find that the first response may not have been adequate since, after all, it didn't stop O'Brien from doing it again? No, I think that the ---- You know, they ---- he engages in inappropriate conduct. The employer takes what ---- The employer, I believe, is allowed to take a ---- Remedial action. And not long afterwards, the same employee does it again. So I'm sort of wondering why can't the jury look at that and say they should have hit him harder? And I believe ---- They should have done more. And if they had done more, then it would have stopped after the first episode rather than having to have them endure more. That may be one way of looking at it. I believe another way of looking at it is that ---- But isn't that what we have juries for when there are two ways of looking at it? That's why we let juries decide these things? Well, you might, but ---- But the admission that this is one way of looking at it, is that pretty much admitting that summary judgment was inappropriate? I'm not sure that I follow your question, but I think that ultimately ---- If that's one way of looking at it, aren't you then saying, yes, the jury could reasonably look at it that way, and in that case, isn't summary judgment inappropriate? When you say that's one way of looking at it. Well, I would say that's one way of looking at it, but in the context of there's no evidence in the record as to what Mr. O'Brien's conduct was in that initial phase and how it was necessarily brought to the attention of the city. And this goes to the Carmen issue in the case. There's no evidence in the record as to what the conduct was at that point in time. And what the city did, which I believe is appropriate, is it chose a remedial measure. And the remedial measure did have some effect. Now, the fact that it ultimately there was subsequent conduct, the city then took the next progressive step to ensure that the conduct that Mr. O'Brien had engaged in with respect to these individuals would not be a transgression that would happen again by suspending him, suspending him without pay for 10 days and transferring him to a different facility. Let's get the Bowersmith then. You're right, it's Bowersmith. Who is he? Mr. Bowersmith was a co-worker of the plaintiff's. What did he allegedly do that contributed to this hostile environment? He allegedly one day had seen Ms. Tabron and had passed by her, and according to Ms. Tabron touched her on the bottom and said something about her behind to her. As a matter of fact, started a whole series of events that turned her derriere into a joke. Allegedly. Well, allegedly, but that's where we are. We have to take the facts and the like most favorable to the plaintiffs, don't we? Yes, but the allegation is from Ms. Tabron. There's no corroborating evidence. There's nobody saying, yes, I heard about this. There doesn't have to be corroborating evidence to generate an issue of material fact. A single witness is sufficient. He's only a sealed document, either. So Bowersmith pats her on the rear end and makes completely inappropriate comments about her rear end and then converts the whole thing into a big joke, right? What happened to him? He was disciplined as well. What happened to him? He was admonished that that behavior was inappropriate, and there's no evidence in the record that he ever repeated that conduct. Except the record, according to what I see, says Bowersmith tried to run over Davis and Tabron with buses after the complaint. What happened to him after he tried to run over him with a bus? That was an allegation that was investigated by the EEO investigator, Ms. Suarez, as part of the whole host of claims that Ms. Tabron and Ms. Davis made against the city. And? And Ms. Suarez found that there was no evidence that, in fact, Mr. Bowersmith had attempted to run over either one of the plaintiffs. Other than Tabron and Davis saying he tried to run over them with a bus. The problem here is, I mean, and I think that's what Judge Kasinsky was getting at, and this is a horrendous series of never-ending harassing incidents by sandbox employees against these two people, and the city may have tried to do something, but it didn't work. I mean, every time they did something, something else happened. I can't even, you read this. Let's talk about Cardwell a little bit, too. Cardwell was one of the worst. I mean, you say there was no complaint against him, but isn't that, in fact, disputed? Didn't they, in fact, try to complain to her, and she gave them all sorts of advice, which I'm not going to repeat because it's too embarrassing. Isn't that alleged? I believe what they allege is that they complained to her that they were having difficulty working with Mr. O'Brien. That there were complaints between them as to assignments and who was doing what. So when you said earlier that they didn't complain to Cardwell about O'Brien, you misstated. They didn't complain to Ms. Cardwell about the things that Mr. O'Brien had said to them. But they did complain. They complained about. They claimed that they complained about the very same things. They complained about, and the excerpts in our moving papers, were that they complained about work-related issues with respect to Mr. O'Brien. Who was cleaning what bus, who was doing what work. They didn't complain that Mr. O'Brien had said to me X, Y, Z. So what did Cardwell respond to all of that? Cardwell's response is that you all need to learn to work together, which led to the subsequent meeting. Didn't they just a little bit more? Didn't they just a little bit more? You want to make life, to make it in life, well, I'm not going to repeat the full statement. But you know the statement. I know the statement. I'm not sure that there's any evidence that that was her statement. I would blush if I were to repeat it, right? So isn't that the kind of thing we really don't want supervisors saying? And if they say it, we want them hit very hard. I think that that is not the context in which Ms. Cardwell made her comment. I don't care about the context. Is that the kind of statement that supervisors are supposed to say to employees at work? No, it is not. So what happened to Ms. Cardwell for that? Ms. Cardwell was removed from her supervisory duties. She was a supervisor. Correct. So they have Foreman. They complain to him, and O'Brien gets a slap on the wrist, not bad enough to keep him from doing it again. And then next comes in Cardwell, and Cardwell gives them advice about their sex life, all sorts of stuff like that. I don't know, you know, all those statements. And that doesn't solve the problem. I don't think that Cardwell was removed right after the complaint was given to Mr. Jones about her conduct. And I think to clarify, Ms. Cardwell's comments to Ms. Tabron and Davis about matters related to sex was not in response to their complaints about Mr. O'Brien. They were separate statements that were made to her. It wasn't Mr. O'Brien is saying X, Y, and Z to us, and Ms. Cardwell responding with these statements regarding ---- So she was wrongfully disciplined. Cardwell should have been restated is what you're saying. No, I'm not saying ---- What I said was okay. I'm not saying that, Your Honor. I'm trying to distinguish between what Ms. Cardwell's response was with respect to O'Brien. Why can't we – why can't a jury look at this sort of egregious course of conduct, including Cardwell's statement, which you so want to gloss over, and say, look, the city really didn't try very hard to solve this problem. On the fuller, they were dragging their feet, and they did very little that effectively solved the problem. And these two plaintiffs were subjected to inappropriate speech and conduct, including fanny patting, and for the – you know, we have cases that say that alone, having another employee touch a private part of the body deliberately, not sort of accidental on somebody, but deliberately, is itself egregious conduct. Why can't the jury look at all this and say, geez, this is really appalling stuff, and the city just didn't try hard enough and really wanted to take this seriously, it could have stopped this a lot sooner? Well, I think ---- You think 12 men and women sitting in the jury box would have to be crazy to come to that conclusion? I think 12 men and women sitting in a jury box would look at the same things that Judge Jenkins looked at and determined with respect to the coworkers whether or not there was appropriate remedial action, which he determined there was, and with respect to Ms. Cardwell, the supervisor. So you'll be happy when you go to a jury? You'll be vindicated? I'm optimistic that we won't be going to a jury on this, and I think ultimately one has to look at the record. This Court's job, as I understand it, is to review de novo the record that was before Judge Jenkins, not the record that may be recreated here in the voluminous record that has been submitted to the Court. All of the depositions ---- I hope I've managed to blunt your optimism just a little bit. Yes, you have, Your Honor. Good. Maybe this is a good case to settle. Just imagine, since you were there with the deputy clerk, just imagine 12 men and women hearing all those words and phrases that you and I were too embarrassed to say, having repeated from the witness stand and just listening to that. Has this been to the mediators? It has been to the mediators here in this Court, and we went to Magistrate Judge Sparrow on at least three occasions for mediation. Is it that the city doesn't want to pay enough? Is that the stumbling block? I believe, without putting a dollar figure on what the plaintiffs think they're entitled to, that yes, the city has made what it believes is a good faith effort to resolve this case and that the plaintiffs did not seem interested in acquiring that. Maybe the city was a little too optimistic based on the advice of counsel. Now the counsel has had his attitude adjusted. Maybe this is a good time for the city to take new advice and try to renegotiate. I will certainly ---- I don't know how my colleagues are going to vote, but I don't think this case is going to end here. It's just my personal prediction. I will take your personal prediction back to my client. Would you like us to suspend the first submission of this case for a week, let's say, for counsel to see whether they can start up, jumpstart serious settlement negotiations? I would certainly entertain that opportunity. Is counsel on the other side interested in that? I didn't want to interrupt counsel's argument. The problem with the settlement, Your Honor, is that the city would only pay any money. I don't think we want to know. If the plaintiffs would leave their employment, which the plaintiffs are unwilling to do. I think you're telling us too much information. So your answer is no, you don't want a settlement discussion? Your Honor, we'd be glad to take another look at it. I would love to settle this case. I think there is an embarrassment to everyone. Well. I don't think we need a speech. Thank you. Okay. Well, we're going to defer submission for a week. And counsel, I seriously advise you to order tape. You see the deputy clerk there? Order tape and play it for your clients. I will do that, sir. And I think you should communicate the fact that there was serious skepticism expressed about your client's position. And that maybe this is a good time to enter into serious negotiations to a settlement in this case. We will defer submission for a week. If we do not hear from counsel or from our mediators within the said week, we will order submission of the case and decide it. Again, I don't know how it's going to come out, but my guess is it's not going to end here. If we do, if counsel are in the process of serious negotiations, they should let us know either if they're working with our mediators, have our mediators send us an internal memo or e-mail letting us know that you need more time, and that's fine. If you're not working with the mediators, send us a letter from one of the counsel representing that both sides wish to continue negotiations. If we don't receive one of those two communications, we'll close the business a week from today. We will order the case submitted and proceed to decide it. Okay? Thank you so much. Thank you, Your Honor. We will now take our break.
judges: B.fletcher, Kozinski, Trott